## ALONZO RUSSELL V. THE STATE.

### No. 283.   Decided June 9.

1. **Rape—Continuance.**—Where, on a prosecution for rape, an application was made for continuance to obtain the testimony of a witness, who, it was stated, would swear, that "he was in the vicinity" of "the spot where the alleged offense was committed," and heard no outcry or call for assistance, *Held*, the application was too vague, indefinite, uncertain, and general, and was properly overruled.

2. **Same—Practice on Appeal.**—On appeal, this court will not reverse for the refusal of a continuance, by the trial court, where the other facts in the evidence exclude the probability of the truthfulness of the proposed testimony of the absent witness.

3. **Rape—Assault with Intent to Rape—Charge—Burden of Proof.**—See charge of the court submitting the issue of assault with intent to rape: *Held*, not subject to the criticism that it required the jury to find affirmatively that defendant did not have carnal intercourse with the prosecutrix before they could consider the question of assault with intent to rape; and *held*, further, not to shift the burden of proof from the State to the defendant.

4. **Same—Statements and Declarations of Defendant—Instructions as to.** On a trial for rape, where the evidence was, that when upbraided for his treatment of prosecutrix, defendant denied it, and stated, "he only stopped her to examine the bridle on her horse;" and defendant as a witness in his own behalf denied this, and denied that he had ever stopped the girl or examined the bridle; and his counsel requested an instruction, in effect, that if his testimony as to this matter was reasonably consistent and not contradictory, it must be taken as true, unless disproved by the State's evidence. *Held*, the refusal of the instruction was correct, because his guilt could not be thus made to depend upon the single circumstance of the denial by defendant of statements imputed to him.

5. **Same—Exculpatory Statements and Declarations of Defendant.**—A defendant's guilt or innocence is not dependent alone upon his own inculpatory or exculpatory statements. An inculpatory or exculpatory statement is but a circumstance to be weighed with the other facts, and guilt may be established without the introduction of any evidence in relation to such statements.

APPEAL from the District Court of Gillespie.   Tried below before Hon. W. M. ALLISON.

Appellant was indicted for the rape of Mary Washington, a female under the age of 12 years.   His trial resulted in his conviction, with the punishment assessed at imprisonment for a term of ninety-nine years in the State penitentiary.

The following is the testimony in full of Mary Washington, the prosecutrix, who testified for the State:   "I know the defendant, Alonzo

Russell. [Points him out to the jury.] I knew him on the 12th day of August, 1893. On that day my mother sent me to my sister's (Mrs. Thompson's) to carry a chicken. I went some time in the morning, I think about 9 o'clock; can not say exactly how early. I went by Mr. Russell's place as I went to Mrs. Thompson's. I met defendant, Alonzo Russell, in Salt branch, about 200 yards from Mr. Russell's house. He spoke to me, and said 'Good morning.' I told him 'Good morning.' He asked me where I was going. I told him I was going to my sister's, Ann Thompson's. He went on down the lane. I went on to my sister's house; and she was not at home. I then went on to Mrs. Britton's, 200 yards further, and got her to plait my hair. After my hair was plaited I started on home, and I again returned by Mr. Russell's. Before I got to Mr. Russell's I met a white man in the lane; don't know who; did not speak. I went on, and in the road that Mr. Gehman had made in hauling rock, where the road runs between Mr. Brown's fence and the river (Pedernales), my horse shied, and the defendant got up from behind a pecan or walnut bush and asked me to let him see my bridle. I told him, he had already seen it; that it was my brother-in-law's, Ben Wren's. He said he had not seen it. I stopped to let him see the bridle. He came up and examined it. I thought he had looked at it long enough, and started my pony on. He held on to the bridle with one hand and pulled me off my horse with the other. He led the horse with one hand and pulled me with the other. I hallooed, and told him I would tell mamma. About fifteen steps from the road he turned the bridle loose, and caught hold of both of my hands and threw me down. He crossed both of my hands on my breast and held them with one hand, and pulled up my dress with the other, and un-buttoned his breeches and took his old thing out, and got on top of me and pushed his privates up into my privates. I hallooed, and told him I was going to tell mamma; and he asked me to lie still and not halloo, and not tell mamma, and that he would get through in a little while. I tried to get loose. When he got up off me he started off, but stopped and asked me if I wanted him to help me on my horse. I told him no, I did not want any black negro helping me. I led my horse to an elm stump, and got on him and rode straight on home. I saw Ben Wren standing at the gate. He said 'Hello' to me, and I said, 'Hello.' Then my mother called to me, and told me to turn my pony into the cow-lot. I did so, and then went around to the front part of the house and told my mother what the defendant (Alonzo Russell) had done. I was crying. My mother examined me, and my clothes were bloody, and I was bleeding. He hurt me when he pushed his old thing up in me. When I got up I was bleeding."

Question: "Tell the jury whether he put his private parts, or penis, into your private parts. That is, did he get it into you?"

Answer: "Yes, he did. In a few minutes after my mother examined me, my brothers Lawrence, Willie, and myself went back to the place where defendant had me down, and I showed them the place. We all walked there. This all took place in Gillespie County, State of Texas. I will be 12 years old the 12th day of next December."

Cross-examined: "It is a mile or more from my father's house to Mrs. Thompson's, and about a quarter of a mile from my father's house to the place where defendant pulled me off my horse and had me down. The road I was on at the time was between Mr. Brown's field and the Pedernales river. The place he dragged me to, about fifteen steps from the road, was on the left-hand side of the road, behind a thicket of bushes, between the fence and the road. I could see the river bank; could not see a house across the river; there was considerable bushes between there and the river, but up towards Brown's there were some trees. There was two ways from our house to my sister's, Mrs. Thompson's—one around by Mr. Russell's; the other bent around the other direction; both ways came together before getting to Mrs. Thompson's. The two ways were about the same distance. We sometimes went by Mr. Russell's, as I did that morning, and sometimes the other way. When I came up to the fence where Ben Wren was I had been crying. When I saw him I wiped my face. He said to me, 'Hello,' and I said, 'Hello.' I did not see my brother Lawrence about there that I remember, nor did he speak to me. I could see my mother as I rode up. I went on around, and she called to me and told me to put my horse into the cow-lot. I was riding barebacked. I had no saddle. It was between 11 and 12 o'clock when I got home. I went directly home from the place where defendant had me down. When I got up after defendant got off of me I saw I was bleeding."

Belle Washington, being sworn, testified: "I am the mother of Mary Washington. She will be 12 years old on the 16th day of December, 1893. On the 12th day of last August I sent her to her sister's, Mrs. Thompson's, about 8 or 9 o'clock in the morning. When she came home it was about half-past 11 o'clock. I did not see her as she came up, but heard her talking to the boys, and called to her to put her pony in the cow-lot. She came around to the front part of the house, where I was, and told me what Alonzo Russell had done, and said she was bleeding. She was crying. I examined her, and found her private parts bleeding; there was blood on her drawers and on her other underclothing. I took a cloth and wet it, and held it to her private parts until it quit bleeding. Mary's monthly sickness had never appeared then, neither has it up to this date; she not being yet 12 years old, she has not reached the years of womanhood. Her drawers were torn; so was her dress ripped part of the way off of the waist, and two or three buttons burst off of the back of her dress. They were not in this condition when she left home in the morning. In a little while after she

came home she and her two brothers, Lawrence and Willie, went off in the direction of where she said it happened."

Cross-examined: "After Mary had returned the second time, that is, after going off with her brothers, I also went on towards Mr. Russell's, and within one or two hundred yards of Mr. Russell's I came up with my sons, Lawrence and Willie, talking to defendant. I went up and talked to him a good deal. I did most of the talking. He denied it, and said he had done nothing to Mary; he had only stopped her and looked at the bridle."

Lawrence Washington, sworn for the State, testified: "On the 12th day of August last, me, brother Willie, and Ben Wren had been working in the field, and got through and came home about 11 o'clock. When Mary came home Ben Wren was standing at the back gate of the yard fence. I was standing not far off. When Mary came up she said 'Hello' to Ben Wren, and 'Good morning' to me. She was not talking in an ordinary tone of voice. I discovered that something was wrong; she was crying a little. My mother called to her to put her horse in the cow-lot. She did so, and then went round to the front part of the house, where my mother was. I think in about ten minutes I and brother Willie and Mary went back, and Mary showed us the place where she said Alonzo Russell had pulled her off her horse, and threw her down and got on top of her. It was where the road goes between Mr. Brown's fence and the river, about twelve or fifteen steps from the road, behind some bushes, and between the river and the road. I saw some horse tracks near there, and saw the place where she said she had been thrown down by defendant. I saw where somebody had been lying. Also the prints of somebody's toes and knees on the ground. Mary then went home, and Willie and I went on towards Mr. Russell's, across Brown's and Russell's fields, to a lane running past Russell's house to the river. About 200 yards from Russell's house we saw Willie Baag coming meeting us, and defendant going up towards his father's house. I whistled to him, and he stopped and waited until we came up to him. Before we overtook him Ben Wren came up on horseback. We accused him of having mistreated Mary, and told him what Mary had said. He denied it, and said it was not true. He said he had stopped Mary there to examine the bridle she had on her horse, because he wanted to trade for it. My mother also came up to us as we were talking, and talked to defendant."

Cross-examined: "When Mary came up to where Ben Wren and I was, mother was in the front part of the house, and us on the back side. She could not see mother from where she was when she spoke to me and Ben. There is a road between Brown's fence and the river. Mary showed us a place on this road where she said that defendant had pulled her off her horse; also a place where she said defendant

had thrown her down and got on top of her; this was between the road and the river."

The testimony of Lawrence Washington as to defendant's statement denying that he had raped the girl, and stating that he had only stopped her to examine the bridle, was corroborated by several of the other witnesses.

Defendant, Alonzo Russell, testified: "On Saturday morning, about 8 or 9 o'clock, I went down to Mr. Brown's to tend to some stock, and met Mary Washington in the road and spoke to her. She asked me if my mother and Brown's folks had gone to Mason. I told her yes, and after she had passed I asked her what was the matter with her bridle. I did not touch the bridle or her. I did not see her but once that day."

Cross-examined: "I went down to feed Brown's stock about 8 or 9 o'clock. I did not return to my father's house any more that morning until after I met Mr. Baag. I had been out in the pasture looking at some poles I wanted to cut. It was not my father's pasture; it was Mr. Schmidtzinsky's pasture. I was on my way home from there when I met Mr. Willie Baag. I met Mary in the road, not at the place she said I did. I did not tell Willie Lawrence, Ben Wren, or Henry Washington that I stopped Mary and examined her bridle because I wanted to trade for it. I thought something was the matter with the head-piece of the bridle."

*A. W. Moursund,* for appellant.

*R. L. Henry,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was charged with and convicted of rape upon a girl under the age of 12 years, his punishment being assessed at ninety-nine years in the penitentiary. His application for a continuance having been overruled, he made this ruling a ground of his motion for a new trial.

By Henry Washington he expected to prove that he "was in the vicinity of the spot where it is alleged the offense was committed, and heard no hallooing or call for assistance." The girl testified to the fact she made outcry. The statement of the proof expected to be made by the absent witness is too indefinite, vague, and uncertain. "In the vicinity" is too general. The "vicinity" covers too much space or territory. Where was the witness? Does "vicinity" mean a few yards, or a mile? What relation does "vicinity" bear to the "spot where * * * the alleged offense was committed?" "In the vicinity" fixes nothing definitely as to locality.

By Wren it was expected to be shown, that "he examined the place where the offense was said to have been committed, and there were no

horse tracks there; while the female alleged to have been raped will testify that her horse was led up to the place where she alleges the offense to have been committed." That the girl was riding along the road is not denied, but shown by all the witnesses testifying in this regard. It was clearly proved by various witnesses that the ground at the place pointed out by the prosecutrix showed signs of a scuffle; the impress of knees were found there, as well as prints of the toes of shoes; and that the horse tracks led from the road to or near the scene of the scuffle. This was within fifteen or twenty steps of the road, behind some bushes. The girl was bleeding from her private parts, her dress and other clothing torn, and her undergarments were bloody. This being the consummated offense of rape, and the girl being under the age of 12 years, the question of consent is not an element of the crime. The facts introduced in evidence exclude the probability of the truthfulness of Wren's testimony, even if he were to testify as alleged.

The criticism that the charge required the jury to find affirmatively that defendant did not have carnal intercourse with the prosecutrix before they could consider the question of assault with intent to rape is not sustained by an inspection of that instrument. This criticism is hypercritical when the charge is viewed as a whole. The instructions criticised are as follows: "But if you should find that defendant did not, as alleged, have carnal knowledge of the said Mary Washington by actual penetration, but should believe from the evidence beyond a reasonable doubt that in the county of Gillespie, said State, at or about the time charged in the indictment, the defendant did make an assault upon the said Mary Washington with intent to commit the crime of rape—that is, with intent to have carnal knowledge of the said Mary Washington—and that said Mary Washington at said time was a female under the age of 12 years * * *; if you believe beyond a reasonable doubt that defendant is guilty of either rape or assault with intent to rape, but have a reasonable doubt as to whether he is guilty of one or the other of these offenses, then you will give him the benefit of the doubt, and not find him guilty of a higher grade of offense than an assault with intent to rape. * * * And if you do not find the defendant guilty of either rape or an assault with intent to rape, you must acquit him." Then follows the charge upon presumption of innocence, and a general charge upon reasonable doubt. The latter is as follows: "If, therefore, after considering all the evidence before you, and the law as given you in the foregoing instructions, you should have a reasonable doubt of the defendant's guilt of any offense, you will give him the benefit of such doubt, and acquit him." In submitting the issue of rape, the court correctly applied in that connection the law in regard to reasonable doubt. No exceptions were reserved as to the charge of the court in any

respect. The court clearly charged the law of reasonable doubt with reference to the consummated crime of rape; therefore the rule as to the burden of proof was not shifted from the State to the defendant under the instructions criticised. Passing from this phase of the case, the court charged the jury, that if the appellant did not have carnal knowledge of the girl they could then consider whether there was an assault made with intent to commit the crime of rape; and in submitting this issue the law of reasonable doubt was again applied; and finally, the court gave in charge the reasonable doubt as applicable to the whole case. Not only so, but this doctrine was applied in the instructions as between the two degrees—rape, and assault with intent to rape. The charge as given did not cast the burden of proof on the appellant, nor reverse the rule as to reasonable doubt. We are unable to see how the jury were, or could have been, misled by the charge given. The facts did not raise the issue of the minor offense, in our opinion, and if they did, it was so remotely done as to be hardly appreciable; therefore the instructions in this respect were favorable to the defendant. No question is raised, however, upon this phase of the charge.

Appellant, upon being upbraided for his mistreatment of the girl, denied it, and stated he only stopped her to examine the bridle on her horse. Such was the evidence for the State. This he denied saying, while testifying in his own behalf, and also denied, as a matter of fact, that he stopped the girl or examined the bridle. In this connection he requested the court to instruct the jury that " * * * such statement, if reasonably consistent and not contradictory, must be taken as true, unless disproved by the evidence by the State." This charge was refused, and very correctly. The proposition asserted in the instructions makes the entire case turn and depend upon the single circumstance contained in and arising out of appellant's statement as imputed to him, and which is denied by him. If the proposition be correct, the State would be enabled to secure a conviction by simply disproving the imputed statements, for the final analysis of the proposition must end just here. A conviction can not be had in this State unless the guilt of the accused is proved beyond a reasonable doubt, by legal and competent evidence. His guilt or innocence is not made dependent entirely upon his own bare statement, exculpating or inculpating himself of the alleged crime. There may be many other facts, and circumstances much more weighty, attendant on the transaction. If the imputed statement be shown false, the converse of the proposition contained in the charge would justify a conviction. The statement itself may be falsely imputed to him, unless the absolute truthfulness of the witness detailing it be admitted. Again, the exculpatory statement is but a circumstance to be weighed with the other facts, and guilt may be completely shown without the State offering any evidence

in relation to such statement.   Pollard v. The State, *ante*, p. 197; Johnson v. The Commonwealth (Ky.), 15 So. W. Rep., 671.

The testimony sustains the conviction, if the State's evidence be true. The jury believed it.   That there was a conflict on this phase of the case does not authorize us to disturb the verdict, when the evidence for the State supports it.

*Affirmed.*

Judges all present and concurring.